19-3013 BPG      19-3014 BPG      19-3015 BPG
19-3016 BPG      19-3017 BPG      19-3018 BPG
19-3019 BPG
19-3020 BPC

**AFFIDAVIT IN SUPPORT OF A**
**CRIMINAL COMPLAINTS AND SEARCH WARRANTS**

Your affiant, Special Agent Douglas Sarsfield, of the Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF) being duly sworn, deposes and states as follows:

## I.   INTRODUCTION

1.       This is an Affidavit in support of a criminal complaint charging Vaness KELLY

(aka "Ness"), Anthony FERGUSON[1] (aka "Papers" aka "Antmoe"), Jamie BARNES (aka "Joker"),

and David RILEY[2] (aka "Crack" aka "D") (collectively, the TARGET SUBJECTS)[3] with: (a)

distribution and possession with the intent to distribute controlled substances, in violation of 21

U.S.C. § 841(a)(1); and (b) conspiracy to commit narcotics trafficking offenses, in violation of 21

U.S.C. § 846 (collectively the SUBJECT OFFENSES).

2.       This is also an Affidavit in support of a search and seizure warrant authorizing the

search of the following locations and vehicles (collectively the **SUBJECT PREMISES** and

**SUBJECT VEHICLES**) described more fully in Attachment A-1 through A-4 for the items

described in Attachment B:

3.       3200 Auchentoroly Terrace, Unit 1R, Baltimore City, Maryland 21217 (**SUBJECT**

**PREMISE 1),** is the current residence of Vaness KELLY.  The said premise is a three-story brick

row home with a walk out basement.  A small set of steps leads to a wooden front door with a clear

glass window.  The numerals "3200" are displayed above the door.  The front door leads to a main

hallway for public access to the units' residents.  Unit 1R is located at the rearmost section of the

---

[1] FERGUSON is currently being detained pre-trial on state drug charges.
[2] Riley is currently being detained pre-trial on state firearms charges.
[3] The TARGET SUBJECTS have been identified in several ways over the course of this investigation: including by: physical surveillance; comparing surveillance photos of the TARGET SUBJECTS to photos kept by the Baltimore Police Department; field interviews; and identification by an undercover officer and confidential source who had extensive contact with several of the TARGET SUBJECTS.

ENTERED _____ LOGGED _____ RECEIVED

SEP 17 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

hallway with a beige colored door. The rear of unit 1R leads to an elevated wooden deck. A set of steps leads from the deck to the rear yard. A glass storm door with a white metal frame is located in front of the rear door of the residence. The rear door appears to be in light in color.

4.      3731 South Hanover Street, 2nd floor (rear alley), Baltimore City, Maryland, 21225 **(SUBJECT PREMISE 2),** is a suspected stash house used by KELLY, FERGUSON, BARNES, RILEY, and others. The said premises is a gray colored cement apartment located in the rear alley of the 3700 block of South Hanover Street. A brown wooden stairwell, approximately 20 steps in length leads to the door of the apartment.

5.      2017 Blue Nissan Sentra bearing Maryland registration 7DC4082 and VIN number 3N1AB7AP1HY405825 **(SUBJECT VEHICLE 1),** which is registered to Tawanda Denise Barber, of 960 Sourtherly Road, #353, Towson, Maryland.

6.      A dark green BMW 330i sedan bearing Maryland temporary license plate 047023T **(SUBJECT VEHICLE 2),** which is registered to Montell Gary Mills of 649 Bentalou Street, Baltimore City, Maryland.

## II.      AFFIANT AND EXPERTISE

7.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so since 2014. I am currently assigned to the Baltimore Field Division, Baltimore Group II, which investigates violations of federal firearms laws, violent crimes, and narcotics trafficking.

8.      I have participated in investigations focusing on controlled dangerous substance (CDS) trafficking, gangs, and illegal firearms. I have conducted covert surveillance of suspected CDS traffickers, interviewed individuals involved in gangs and the CDS trafficking trade, participated in Title III wiretap investigations, participated in the execution of state and federal

search and arrest warrants involving CDS traffickers and violent offenders, and participated in the seizure of numerous firearms and CDS.

9.　　Through my training, education, and experience, I have become familiar with the manner in which illegal CDS and firearms are transported, stored, and distributed, and the manner in which CDS traffickers communicate with each other.  Based on my knowledge, training, and experience, individuals involved with drug trafficking activities and illegal firearm possession frequently use cellular telephones, social media accounts, communication devices, and other electronic media storage to further their illegal activities.  Specifically, I know that persons engaged in CDS trafficking use cellular telephones to coordinate with suppliers, customers, and co-conspirators and frequently switch phones or utilize multiple cellular telephones to evade law enforcement.

10.　　The information set forth in this affidavit derives from my personal knowledge and observations; discussions with other ATF agents and employees, other law enforcement officers, and witnesses; and my review of police reports and public records.  Because I submit this affidavit for the limited purpose of establishing probable cause for a search warrant, I have not included every fact known to me concerning this investigation.  Rather, I set forth only those facts that I believe are necessary to establish probable cause.  I have not, however, excluded any information known to me that would defeat a determination of probable cause.

III.　　**EVIDENCE OF DRUG TRAFFICKING BY THE TARGET SUBJECTS**

　　A.　　**METHODS AND MEANS OF DRUG TRAFFICKING**

11.　　Through training and experience in drug trafficking investigations and arrests, I have become familiar with the actions, traits, habits, and terminology utilized by drug traffickers.  I am familiar with the ways in which narcotic traffickers conduct their business, including methods

3

of importing and distributing narcotics, money laundering, the use of cellular telephones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. Based on this familiarization, I know the following:

12.     Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses. Drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity;

13.     Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell. In that regard, I know that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization;

14.     Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators. In addition, drug traffickers will often change their cellphones following the arrest of a member of their drug trafficking organization (DTO), or at random times in order to frustrate law enforcement efforts;

15.     Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

16.     Drug traffickers often arm themselves and their organization to protect their drug trafficking activities from rival drug traffickers.

17.     Drug traffickers keep controlled substances, as well as paraphernalia (to include packaging materials, scales etc.) in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses.

18.     Drug traffickers frequently keep and maintain records of their various activities. Such records frequently are kept to keep track of money owed to them by other drug traffickers and money that they owe to drug suppliers, and to maintain contact information for other drug traffickers and suppliers.  Experience in similar cases has established that such records are frequently concealed in a suspects residence and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, and that they take various forms.  Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators.  The aforementioned items are kept in locations that are considered safe by the drug traffickers and where they have ready access to them, such as safety deposit boxes, their residences, in their vehicles and on their person.

5

19.     Drug traffickers, due to advancement in technology, may be utilizing computers or other electronic storage media to store the records listed above.

20.     Drug traffickers must maintain on hand large amounts of United States currency in order to maintain and to finance their ongoing narcotics business. Based on training and experience I know that persons involved in large scale drug trafficking conceal in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, currency, financial instruments, and evidence of financial transactions relating to narcotics trafficking activities.

21.     Drug traffickers frequently utilize cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. Documents referencing the possession or use of cellphones, such as bills, cellphone boxes, receipts for phones or payment, etc., are of evidential value insofar as their evidence of a suspect's possession of a particular phone. Moreover, the electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals. I know that drug traffickers often keep in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, cellular telephones and documents referencing the possession of those phones.

22.     Drug traffickers frequently take or cause to be taken photographs of themselves, their associates, their proceeds, and their narcotics. Drug traffickers commonly have such photographs in their residences, vehicles, places of work, electronic devices, or on their person. In

6

a criminal conspiracy case such as this, photographs of co-conspirators with one another is evidence of their association with one another and thus can be used as evidence of their participation in a common conspiracy.

23.     Drug traffickers commonly have in their possession -- that is, on their persons and in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses-- firearms and other weapons, which are used by the traffickers to protect and secure their narcotics and proceeds from loss to law enforcement agents or to other criminals who may attempt to steal money and drugs.

**B.     CASE BACKGROUND**

24.     In late 2018, ATF and the Baltimore Police Department ("BPD") began investigating a suspected drug trafficking organization (DTO) operating an open-air drug "shop" that sells cocaine base (crack cocaine) to retail customers in and around the 3700 block of 2nd Street, in Baltimore City, Maryland.  Pursuant to this investigation, investigators have conducted physical surveillance, obtained and analyzed phone and social media data, and conducted controlled purchases of controlled dangerous substances (CDS) from members of the DTO.  To date, investigators have purchased or recovered approximately 149 grams of suspected crack cocaine from the **TARGET SUBJECTS** and other members of the DTO.   Based on evidence gathered thus far, I believe that Vaness KELLY is the leader of the DTO; Anthony FERGUSON is a close associate of KELLY; and Jamie BARNES and David RILEY are retail sellers of narcotics for the DTO.

25.     Over the course of this investigation, it has become apparent that the **TARGET SUBJECTS** are working together to sell narcotics in and around 3700 Hanover Street.  As

7

explained more fully below, the **TARGET SUBJECTS** (both individually and as a group) have been regularly surveilled[4], at or near the drug "shop," at times conducting what appear to be hand-to-hand drug transactions.  The **TARGET SUBJECTS** also appear to share a common suspected stash house located at **SUBJECT PREMISE 2.**

26.    Contact between CS-1 and the **TARGET SUBJECTS** has also made clear that the **TARGET SUBJECTS** are working in concert.  CS-1 initially made contact with RILEY to conduct controlled purchases of CDS.  When RILEY could not provide the full amount of the order, RILEY recruited BARNES and others to assist him with completing the sale.  Later, BARNES completed a drug transaction with CS-1, while in the presence of FERGUSON and after the deal, FERGUSON immediately told CS-1 to save his phone number.  After numerous deals with FERGUSON, FERGUSON directed CS-1 to purchase CDS from KELLY.

27.    An analysis of telephone records associated with the **TARGET SUBJECTS** also evidences a connection amongst the **TARGET SUBJECTS**.  These records reveal that from April 2019 to July 2019, there was a high-volume of communications amongst the **TARGET SUBJECTS.**  Indeed, each **TARGET SUBJECT** was among the 10 most frequently called individuals by the other **TARGET SUBJECTS.**  In many cases, communication between the **TARGET SUBJECTS** involved frequent telephone calls of short duration, frequently under 2 minutes, consistent with habits of drug traffickers.  During numerous purchase of CDS by CS-1, **TARGET SUBJECTS** were in frequent contact with one another in moments immediately before and after controlled purchases of CDS.

---

[4] This surveillance has included physical surveillance, CCTV surveillance, cellphone tracking and vehicle tracking.

## C. SURVEILLANCE AND POLE CAMERA FOOTAGE

28.      Throughout this investigation, law enforcement has used fixed video cameras in the vicinity of the 3700 block of S. Hanover Street (a rear alley shared running parallel between S. Hanover Street and 2nd Street) to surveil the **TARGET SUBJECTS.**  Investigators have regularly monitored the video footage from these cameras or reviewed the footage from the cameras after it was recorded.  At different times during this investigation, investigators saw many of the suspected DTO members, to include the **TARGET SUBJECTS** regularly in and around the 3700 block of S. Hanover Street, 3700 2nd Street and the rear alleys and side streets nearby.  The **TARGET SUBJECTS** were observed interacting with each other and conducting what appeared, based on investigators training, knowledge and expertise, to be numerous, daily hand-to-hand drug transactions.  Numerous non-fatal shooting have also occurred in close proximity to the area of the DTO's operations.  Given the close proximity of this drug activity and the way in which the **TARGET SUBJECTS** interacted and appeared to coordinate with each other, I believe, based on my training, knowledge and expertise, that the **TARGET SUBJECTS** worked together to operate an open-air retail drug operation in the 3700 block of 2nd / S. Hanover Street.

### D.   CONTROLLED PURCHASES AND SURVEILLANCE

29.      Pursuant to this investigation, between, a registered ATF Confidential Informant (hereinafter referred to as "CS-1")[5]  CS-1 and an undercover ATF agent ("UCA") made controlled purchases of narcotics from the **TARGET SUBJECTS** in around the 3700 block of 2nd Street and

---

[5]      CS-1 has purchased CDS for personal use in the past and therefore knows how narcotics are bought, packaged, sold, and used.  CS-1 has provided members of law enforcement with accurate information relative to narcotics in the past, which has been corroborated, to the extent possible, through investigation.  CS-1 has also successfully conducted controlled purchases under the direction of members of law enforcement.  CS-1 is working for monetary compensation.

SUBJECT PREMISE 1.[6]  Based on the observations of CS-1 and the UCA, the manner in which these transactions were conducted, their close proximity to each other, and the way in which different suspects at different times and working in different combinations conducted these sales, I believe that the **TARGET SUBJECTS** were working together to distribute crack cocaine near the 3700 block of 2nd Street.  Each of these controlled purchases is described in more detail below. Given the alternating combinations of suspects involved in each transactions, they are listed here in chronological order.

30.     On March 7, 2019 an ATF investigator conducted surveillance near the 3700 block of 2nd Street.  DTO members, to include FERGUSON, BARNES, and Carlos YOUNG were observed in the area.  During the course of a numerous hours, suspected drug customers users made contact with YOUNG, BARNES, FERGUSON and made suspected hand-to-hand CDS transactions.  The suspected CDS transactions followed a consistent pattern, where suspected users waited in designated areas or followed DTO members prior to the transactions.

31.     On March 14, 2019, ATF investigators conducted a controlled purchase of CDS from RILEY.  On that date, RILEY was observed in the 3700 block of 2nd Street making numerous suspected hand-to-hand drug transactions with individuals who walked and drove into the block, met RILEY, then quickly left the area.  CS-1 made contact with RILEY and asked for "four." RILEY replied "Girl [crack cocaine] or Boy [heroin]"?  CS-1 replied "stones", referring to crack cocaine and RILEY immediately walked to the side of 3720 2nd Street.  RILEY returned a short time later and provided CS-1 with a small quantity of suspected crack cocaine.  CS-1 asked for more CDS and obtained RILEY's phone number, then departed the area.  The suspected crack cocaine was sent to the BPD drug laboratory for analysis; results are pending.

---

[6]  These controlled purchases were audio and video recorded and investigators have reviewed these recordings.

32.     On March 20, 2019, ATF investigators conducted a controlled purchase of suspected crack cocaine from RILEY. Prior to the controlled purchase, RILEY and KELLY were observed standing in front of and later entering 3720 2nd Street, a suspected stash location. At approximately 1:30pm, CS-1 called RILEY, advising RILEY that he (CS-1) had just gotten paid and was trying to "come through" [to purchase CDS]. RILEY told CS-1 to call back when CS-1 arrived at the intersection of 2nd Street and Garrett Avenue.

33.     Soon after, CS-1 walked to 2nd Street and Garrett Avenue and called RILEY, advising that he/she had arrived. Within minutes, RILEY exited the side yard of 3720 2nd Street, approached CS-1 and asked if CS-1 wanted "boy" [heroin] or "girl" [cocaine]. CS-1 asked to purchase crack cocaine. At the same time, two individuals approached RILEY and said they were looking for "boy" before explaining to CS-1 that they did not like RILEY's "boy" and departed the area. After taking CS-1's order, RILEY met briefly with KELLY, who then left the area. RILEY returned to CS-1 and provided CS-1 with suspected crack cocaine in exchange for $20.00. RILEY told CS-1 that his (RILEY's) brother would return soon with more CDS. At that moment, an individual approached RILEY, asking where his "brother" had gone. RILEY ~~explained that~~ advised he would have a lot "more" [believed to be a reference to CDS] in about 35 minutes. RILEY told CS-1 to contact him again in a few minutes for more CDS. Approximately 30 minutes later, CS-1 was directed to call RILEY back and RILEY advised he was still waiting on his brother,

at which time the operation was concluded.  The suspected crack cocaine was sent to the BPD drug laboratory for analysis; results are pending.






*RILEY meets CS-1 and others, then walks over to KELLY whom is believed "brother"*

34.      On March 28, 2019, ATF investigators conducted a controlled purchase of suspected crack cocaine from RILEY, BARNES, and Sean MITCHELL.   On that date, CS-1 walked into the 3700 block of 2nd Street, and made conversation with an individual in the area.  CS-1 asked where "Crack" a/k/a RILEY could be found.  The individual advised that RILEY was "upstairs," walked up to 3720 2nd Street and yelled to someone inside to tell RILEY to come outside.  RILEY exited the residence and advised that he had sold all his "nickels" but still had a few "dimes" left.  Based on my training, knowledge and expertise I know that "nickels" are $5 increments of CDS and that "dimes" are $10 increments.  CS-1 asked for eight "dimes;" RILEY

12

responded that he could not provide that many but that his "man" had some. RILEY then walked towards the rear alley of the 3700 block of 2nd/S. Hanover Street and returned a short time later with five small plastic containers in the shape of small trashcans containing suspected crack cocaine. RILEY then handed the trashcans to CS-1 in exchange for $50.00. After providing the five containers to CS-1, RILEY walked to the side of 3720 2nd Street and yelled inside. A moment later, BARNES exited the side door and met with CS-1. CS-1 asked for "three". BARNES asked CS-1 if he/she wanted "boy" or "girl". CS-1 advised that he/she wanted "girl" and BARNES replied that he only had "one" left. RILEY asked BARNES, "You ain't got no girl?" to which BARNES replied "I got one." BARNES then walked back to CS-1, pulled out a clear bag containing dozens of black and white colored pills, located one clear pill containing suspected crack cocaine and handed it to CS-1, in exchange for $10.00. Soon after, MITCHELL approached CS-1 and sold him/her two zip lock bags containing suspected crack cocaine in exchange for $20.00. After the sale, MITCHELL met with BARNES and RILEY. The suspected crack cocaine was sent to the BPD drug laboratory for analysis; results are pending.

*RILEY sells to CS-1 then retrieves BARNES; BARNES sells to CS-1 and holds bag of suspected heroin*

  

35.     On April 3, 2019 ATF investigators made a controlled purchase of crack cocaine from BARNES. CS-1 walked into the 3700 block of South Hanover area and observed BARNES, FERGUSON and another male standing and sitting on the front porch steps of a vacant home at 3800 2nd Street. CS-1 approached BARNES and asked for ten "girl" [cocaine]. BARNES reached into his pocket multiple times and ultimately handed CS-1 ten purple trashcans containing crack cocaine in exchange for $100.00. CS-1 asked where RILEY was and BARNES advised that RILEY would be out soon. BARNES appeared to begin handing FERGUSON a portion of the cash, when FERGUSON told CS-1, "Take my number!" at which time BARNES withdrew his hand. The crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine base.



*BARNES sells to CS-1 then FERGUSON gives CS-1 his phone number*

36.     On April 5, 2019, an ATF investigator observed FERGUSON exit a residence at 1533 N. Payson Street in the early morning hours, enter the driver's side of a green Nissan Altima and left the area.   Approximately 40 minutes later, the green Nissan Altima was seen entering the 3700 block of 2nd Street. FERGUSON exited the driver's side of the vehicle and BARNES appeared from the passenger side of the vehicle. A few moments later, BARNES was observed making contact with a group of three white male and female suspected buyers. BARNES walked

14

the group towards the rear alley of the 3700 block of 2nd Street and disappeared. Meanwhile, FERGUSON walked to the head of the alley and appeared to act as a lookout. Based on my training, knowledge and expertise, I believe that FERGUSON and BARNES were conducting hand-to-hand drug sales to retail buyers.

37.     On April 8, 2019, ATF saw FERGUSON enter the green Nissan parked near 1533 N. Payson Street and travel to the 3700 block of 2nd Street. At approximately 9:40 and 11:30 am, FERGUSON was observed conducting suspected hand-to-hand drug sales.

38.     On April 9, 2019, ATF investigators conducted a controlled purchase of suspected crack cocaine from FERGUSON. CS-1 made a controlled phone call to FERGUSON at phone number 443-351-5380. FERGUSON answered and CS-1 advised that he/she wanted to purchase $100.00 of crack cocaine. A short time later CS-1 met FERGUSON near the 3700 block of 2nd Street where FERGUSON provided CS-1 20 plastic trash cans containing suspected crack cocaine in exchange for $100.00. CS-1 observed Carlos YOUNG acting as a lookout during the transaction with FERGUSON. The suspected crack cocaine was sent to the BPD drug laboratory for analysis; results are pending.

39.     On April 17, 2019, ATF investigators conducted a controlled purchase of suspected crack cocaine. On that date, CS-1 made contact with FERGUSON via telephone and arranged a purchase of crack. Prior to the sale investigators saw Donald PEATON making suspected CDS sales to buyers near the rear alley of the 3700 block of 2nd Street. A short time later CS-1 went to the location of the drug shop and met with FERGUSON. FERGUSON provided CS-1 with 11 containers of suspected crack in exchange for $100.00; then walked to alley where PEATON had been spotted making suspected sales, before returning to CS-1 and providing him the remaining

crack requested. The suspected crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine base.

40.     On April 24, 2019, ATF investigators conducted a controlled purchase of crack cocaine from FERGUSON. On that date CS-1 made contact with FERGUSON by phone and discussed purchasing one-eighth of an ounce of crack for $175.00. Soon after, investigators saw FERGUSON drive into the 200 block of Jeffery Street. FERGUSON exited his vehicle and was met by Carlos YOUNG and Brandon BURTON. The group walked to the corner of Hanover Street and Garrett Street, where DTO members had often been seen loitering together. At approximately 12:17 pm, CS-1 called FERGUSON and told him that he/she had arrived in the area. FERGUSON walked away from the group and met CS-1 near the corner of 2nd Street and Garrett Street. CS-1 exchanged $175.00 in pre-recorded ATF agent cashier funds, in exchange for a clear bag containing approximately one-eighth of an ounce (with packaging) of crack cocaine. The suspected crack was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine base.

41.     On May 1, 2019, investigators conducted a controlled purchase of crack cocaine from FERGUSON. CS-1 contacted FERGUSON by phone and a short time later entered the 3700 block of 2nd Street. BURTON, James YOUNG, and another individual entered the block and BURTON approached CS-1. CS-1 advised BURTON that he/she was waiting for FERGUSON. Investigators observed FERGUSON exit the rear alley of the 3700 block of 2nd Street just before he met with CS-1. FERGUSON then exchanged seventeen pink and blue colored trashcan/jugs with CS-1 in exchange for $140.00. After the sale, CS-1 and FERGUSON discussed a future purchase of one-quarter of an ounce of crack cocaine. The crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for cocaine base.

16

42.     On May 7, 2019, investigators conducted a controlled purchase of crack cocaine from FERGUSON. On that date, CS-1 contacted FERGUSON by phone; FERGSON advised that he would meet CS-1 shortly and was observed by investigators driving his green Nissan Altima into the rear alley of the 3700 block of S. Hanover/ 2nd Street. FERGUSON exited his vehicle and at approximately the same time, Carlos YOUNG walked into the alley near FERGUSON and towards 2nd Street. An ATF investigator observed YOUNG flag down a Nissan Murano near the 200 block of E. Talbott Street and make a suspected hand-to-hand drug transaction with the occupant of the vehicle. After that transaction, YOUNG walked back to 2nd Street and waited near CS-1, possibly acting as a lookout for FERGUSON. FERGUSON approached CS-1 and exchanged 19 yellow trashcan/jugs containing suspected crack cocaine in exchange for $175.00 in pre-recorded ATF agent cashier funds. At approximately the same time, YOUNG departed the area and was seen walking back into the same alley that FERGUSON exited to meet CS-1. The crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine base.

43.     On May 16, 2019, ATF investigators conducted a controlled purchase of crack cocaine from FERGUSON. CS-1 contacted FERGUSON by phone and the two discussed CS-1 purchasing an "eight ball" [one-eighth of an ounce of crack cocaine]. A short time later CS-1 entered the 3900 block of 2nd Street and called FERGUSON to say that he/she was ready to make the sale. Soon after, Tonya JOYNER approached CS-1 and asked if CS-1 was waiting for "NESS" [believed to be a reference to Vaness KELLY]. JOYNER told CS-1 that she was waiting on someone; CS-1 replied that she must be waiting on him/her. JOYNER asked "175?" [the price in dollars for the "eight ball"] and CS-1 replied, "That's me, 175." CS-1 told JOYNER that he typically dealt directly with FERGUSON; JOYNER explained that FERGUSON had directed her to complete the sale to CS-1. CS-1 directed JOYNER to call FERGUSON on the telephone; JOYNER

placed the call and gave the phone to CS-1. FERGUSON confirmed that JOYNER was conducting

a sale at his direction. JOYNER later told CS-1, "This his, it aint mine. I be selling pieces of shit,

here and there... I might get some like, boy or some girl." The crack cocaine was sent to the BPD

drug laboratory for analysis and tested positive for the presence of cocaine.

44.　　　On May 23, 2019, ATF made a controlled purchase of crack cocaine from Vaness

KELLY, facilitated by FERGUSON. On that date, CS-1 contacted FERGUSON by phone to

arrange a purchase of crack cocaine. FERGUSON advised that he was unavailable, but directed

CS-1 to call his "brother" at telephone number 443-814-2832. CS-1 then called KELLY at 443-

814-2832 and arranged to purchase an eighth of an ounce of crack. Later that day CS-1 walked to

2nd / Jeffery Street and waited for KELLY. KELLY arrived in **SUBECT VEHICLE 1.** KELLY

handed CS-1 approximately one-eighth of an ounce of suspected crack cocaine, in exchange for

$175.00 in pre-recorded ATF agent cashier funds. KELLY advised CS-1 that he could sell CS-1

whatever he wanted, mentioning ounces and half ounce sized quantities of CDS. The crack cocaine

was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine

base.





*KELLY meets CS-1 in **SUBJECT VEHICLE 1** to conduct CDS transaction*

45.     On June 6, 2019 ATF investigators conducted a controlled purchase of crack

cocaine from KELLY, with the assistance of FERGUSON. On that date, CS-1 contacted

FERGUSON at 443-351-5380 and asked to purchase crack cocaine. FERGUSON told CS-1 that he

was in class and told CS-1 to contact his brother [KELLY]. CS-1 contacted KELLY at 443-814-

2832 and asked to purchase one-quarter of an ounce of crack cocaine. KELLY agreed to make the

sale. At approximately 1:44 pm, a covert surveillance camera in the rear alley of the 3700 block of

2nd/S. Hanover Street recorded KELLY exiting the second story stairwell leading to the rear

apartment of **SUBJECT PREMISES 2**. KELLY walked to **SUBJECT VEHICLE 1** parked

nearby in the alley and drove directly to CS-1, who was waiting at 2nd Street and Jeffery Street.

KELLY told CS-1 to get into the vehicle due to police activity currently in the area. Once inside,

KELLY began talking about the crack he was selling CS-1 and exclaimed "The bitch gave this a

ten… she said a ten!" KELLY then exchanged a small bag of approximately one-quarter of an

ounce of suspected crack cocaine in exchange for $350.00. CS-1 asked if KELLY "cooked"

[prepared] the crack himself and KELLY advised that he had. KELLY asked CS-1 if he/she could

"cook" crack cocaine; CS-1 acknowledged that he/she could. KELLY replied "we get ounces…and

let you put that shit together". Based on my training, knowledge and expertise I believe that during this exchange KELLY was offering CS-1 the opportunity to "cook" crack for the DTO. The crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine base.

46.     On June 6, 2019, investigators saw KELLY and JOYNER exiting **SUBJECT PREMISES 2** multiple times throughout the day.  KELLY was observed making what appeared to be CDS sales in the adjacent in the alley.  Investigators subsequently learned from law enforcement databases that Tonya JOYNER is listed as a current resident of **SUBJECT PREMISES 2**.

47.     On June 12, 2019 ATF investigators conducted a controlled purchase of crack cocaine from KELLY.  On that date, CS-1 contacted KELLY and arranged to purchase one-quarter of an ounce of crack cocaine.  At approximately 2:00 pm, a surveillance camera recording the alley of the 3700 block of 2nd/ S. Hanover Street recorded RILEY walk into **SUBJECT PREMISES 2.** At approximately 3:05 pm, JOYNER exited **SUBJECT PREMISES 2.**  At approximately 3:06, KELLY was observed walking down the stairs from **SUBJECT PREMISES 2.**  At approximately 3:12 pm, RILEY and KELLY met in the rear alley stairwell by **SUBJECT PREMISES 2** and the two communicated briefly before KELLY entered **SUBJECT VEHICLE 1** and drove directly to CS-1, who was waiting nearby in the 3800 block of 2nd Street.  CS-1 entered KELLY's vehicle and KELLY handed CS-1 approximately one-quarter of an ounce of suspected crack cocaine in exchange for $350.00.  CS-1 asked KELLY how much an ounce of crack cocaine would cost; KELLY responded that it would cost $1400.00.  The suspected crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine base.

48.     On June 17, 2019 at approximately 08:48 am, investigators saw KELLY in front of **SUBJECT PREMISES 1.**  KELLY walked to **SUBJECT VEHICLE 1** and exited the area.  On

June 18, 2019, KELLY was again observed in front of **SUBJECT PREMISES 1.** As investigators watched, KELLY walked to **SUBJECT VEHICLE 1** and exited the area.

49.     On June 19, 2019, ATF investigators conducted surveillance of the 3700 block of S. Hanover Street.  On that date, at approximately 2:03 pm, a surveillance camera saw **SUBJECT VEHICLE 1** drive into the rear alley of the 3700 block of 2nd/S. Hanover Street and park.  As KELLY exited the car, BARNES[7] walked into the alley.  BARNES and KELLY shook hands and then both walked up the stairs and into **SUBJECT PREMISES 2.** KELLY appeared to be carrying a large white object.  Meanwhile, the front vehicle passenger of **SUBJECT VEHICLE 1**, later observed to be FERGUSON, waited inside **SUBJECT VEHICLE 1.** At approximately 2:06 pm, BURCH entered the alley and met with FERGUSON, who was still sitting inside the vehicle.  At approximately 2:09 pm, BURCH went inside of **SUBJECT PREMISES 2.** At approximately 2:12 pm, BARNES exited **SUBJECT PREMISES 2** and met with a white female in the alley, then walked her around the corner.  The habit of meeting in the alley was consistent with similar characteristics used by DTO members in the past to deal CDS to customers.  At approximately 2:14 pm, KELLY exited **SUBJECT PREMISES 2** with the same large white object.  FERGUSON exited the vehicle and departed the alley on foot with BURCH, while KELLY exited the alley in **SUBJECT VEHICLE 1.**

50.     For the rest of the afternoon and evening, investigators saw BARNES, BURCH, FERGUSON and other suspected members of the drug shop conduct what appeared to hand-to-hand drug transactions with retail customers.  Investigators also saw these individuals moving in and out of **SUBJECT PREMISES 2.** Based on these observations as well as my training,

---

[7] Approximately two hours before BARNES was observed walking into the alley, he posted an Instagram (IG) live video under the IG handle " _jokerbby" believed to be associated with him from photos and a profile photo of BARNES.  In the video, BARNES fanned dozens of $100 bills in front of a camera.

knowledge and expertise, I believe that DTO was using **SUBJECT PREMISES 2** as a stash location for the DTO.

51.     On June 20, 2019, ATF investigators conducted a controlled purchase of crack cocaine from KELLY.  On that date, at approximately 2:40 pm CS-1 walked to the intersection of 2nd Street and Jack Street and advised KELLY that he/she was coming to meet KELLY.  A short time later, KELLY arrived, driving **SUBJECT VEHICLE 1.**  CS-1 entered KELLY's vehicle and handed KELLY $350.00 in pre-recorded ATF agent cashier funds, and in exchange, KELLY gave CS-1 two small baggies of suspected crack cocaine.  CS-1 asked if KELLY's brother [FERGUSON] was mad that CS-1 was dealing with KELLY.  KELLY quickly replied "No, hell no, hell no!  All the money go into the same hand… What I got, he got.  What he got, I got.  We stick together as one." The crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine.

52.     On June 25, 2019, CS-1 introduced an undercover ATF agent ("UCA") to KELLY during a controlled purchase of crack cocaine.  On that date, CS-1 arranged to purchase an ounce of crack cocaine from KELLY.  In prior conversations with KELLY, CS-1 had explained that he (CS-1) was working with another individual (a role played by the UCA) to sell larger amounts of crack cocaine.   At approximately 4:20 pm, CS-1 and the UCA drove to 2nd Street and Jeffery Street and waited for KELLY.   At approximately 5:38 pm, KELLY arrived in the area in **SUBJECT VEHICLE 1** and approached CS-1 and the UCA.  FERGUSON was observed approximately one block away acting (I believe based on my training, knowledge and expertise), as a lookout.

53.     KELLY entered the UCA's vehicle and provided an ounce of suspected crack cocaine in exchange for $1400.   During the sale KELLY asked if the UCA had firearms or knew how to get firearms.  KELLY advised that he was looking for "Glock 40's," "9's" and suppressors

[silencers].  KELLY advised he wanted a Draco [AK-47 style semi-automatic pistol] and 50 round drums [magazines].  KELLY advised he needed to cut down on noise and wanted to be able to get close to a "situation" in order execute a "quick, clean job" and "get outta there" before police arrived.  KELLY told the UCA that his name was "NESS" then gave the UCA his phone number, 443-351-2832.  The crack cocaine was sent to the BPD drug laboratory for analysis and tested positive for the presence of cocaine base.

54.     On June 27, 2019, the UCA contacted KELLY and arranged for the purchase of one ounce of crack cocaine.  KELLY told the UCA that he had to pick up the crack and prepare it and a short time later was seen exiting 1153 Carroll Street in Baltimore City and running to **SUBJECT VEHICLE 1.**  A GPS tracking device affixed to **SUBJECT VEHICLE 1** indicated that KELLY's vehicle made a quick stop in the 700 block of Reservoir Street, where I believe KELLY obtained a quantity of cocaine.  KELLY then drove to the **SUBJECT PREMISES 1** where an ATF investigator saw his vehicle parked.  Approximately fifteen to twenty minutes after arriving, at approximately 2:54pm an investigator observed KELLY run out of the rear side of **SUBJECT PREMISES 1**, at which time KELLY called the UCA and told him that the CDS was "drying" and that he was on his way.  It is my belief that KELLY took cocaine to his residence at **SUBJECT PREMISES 1**, "cooked" the cocaine to convert it into crack cocaine, then left the residence to meet the UCA.  When KELLY met with the UCA, he told the UCA that the crack was still wet because he had just cooked it.  KELLY then handed the UCA a clear bag containing approximately 28 grams of suspected crack cocaine, in exchange for $1400 in pre-recorded ATF agent cashier funds.  KELLY and the UCA also continued a previous conversation about firearms.  KELLY advised that he currently had a Glock pistol and that it was in his car.  KELLY explained, "I got a few situation I'm trying to eliminate, you understand what I'm saying?  Once I eliminate the situation, I can walk

23

light, I can breathe light." Upon KELLY exiting the UCA vehicle, investigators attempted to

follow KELLY, lost sight of KELLY's car and notified the Baltimore City Police Department of a

possible firearm in KELLY's vehicle. The crack cocaine was sent to the BPD drug laboratory for

analysis and tested positive for the presence of cocaine base.



*KELLY weighs CDS in UCA vehicle along with money*

55.     On July 10, 2019 an ATF investigator conducted surveillance of the rear of

**SUBJECT PREMISES 1. SUBJECT VEHICLE 1** was observed parked on the street nearby. At

approximately 7:58 am, KELLY was seen exiting the rear door (labeled "1R") of the first floor

apartment, then walked to his vehicle. A law enforcement database revealed that Jessica Frierson is

currently using apartment 1R as her listed residence. A query of Frierson's previous residences

indicated she previously resided at 4216 Eldone Road, #1, Baltimore MD 21229; the same address

used by KELLY in the past.

56.     On July 12, 2019, CS-1 made contact with KELLY and arranged to purchase one-

eighth of an ounce of crack cocaine. Shortly after making contact with KELLY, a GPS tracker

affixed to **SUBJECT VEHICLE 1** showed that the vehicle began moving towards **SUBJECT PREMISES 1.**  Approximately fifteen minutes later, the GPS tracker showed that **SUBJECT VEHICLE 1** was parked close to **SUBJECT PREMISES 1.**  At approximately 10:59 am, KELLY called CS-1 and advised that he was on his way to meet CS-1[8].   At approximately 1:18 am, KELLY met with CS-1 near the 3700 block of 2nd Street. CS-1 entered KELLY's vehicle and KELLY handed CS-1 a small baggie containing approximately one-eighth of an ounce of suspected crack cocaine, in exchange for $175.00 in pre-recorded ATF agent cashier funds.  CS-1 told KELLY that the CDS looked to be less than the requested amount.  KELLY showed CS-1 another baggie of CDS and advised "All of em' straight..." The suspected crack cocaine was sent to the BPD drug laboratory for analysis; results are pending.

57.     On July 31, 2019 ATF investigators conducted a controlled purchase of suspected CDS from KELLY.  On that date, the UCA contacted KELLY at 43-351-2832 advising that he wanted to purchase two ounces of crack cocaine.  KELLY advised that he could fulfill the UCA's order.  At approximately 10:37 am, KELLY directed the UCA to come to 3110 Auchentoroly Terrace, located one block from **SUBJECT PREMISES 1.**  Once the UCA arrived in the area, an investigator saw KELLY exit the rear yard of **SUBJECT PREMISES 1** and then enter the UCA's vehicle.  Once in the vehicle, KELLY exchanged two clear bags containing 56 grams of suspected crack cocaine for  $2,800.00.  The UCA asked about "birds" [referring to kilograms of cocaine].  KELLY responded that he was "around a lot of shit...bricks [kilograms] and caine."  KELLY advised that the price of a kilogram varied between "32 and 35" [$32,000 to $35,000 per kilogram].  The conversation shifted to KELLY giving the UCA advice on how to conceal CDS or firearms

---

[8]  Based on previous controlled purchases from KELLY, in which he drove and/or departed from **SUBJECT PREMISES 1** in order to prepare and later effect a sale of CDS, it is my belief that KELLY drove to **SUBJECT PREMISES 1** in order to manufacture/prepare/package the CDS order just placed by CS-1.

inside of the UCA's vehicle better. KELLY told the UCA that he had a history of having his home raided and knew how to evade law enforcement. The conversation later turned to the previously discussed purchase of firearms. KELLY advised that he knew other people who would be interested in purchasing firearms from the UCA. The UCA advised that he was open to negotiating prices of firearms but did not know what was fair in the Baltimore area. KELLY explained that a .40 caliber pistols typically cost approximately $600-$700, a 9mm millimeter pistol typically cost $500-$550, and a .38 caliber handgun typically cost approximately $350-400 because they are not semi-automatic firearms, then said they cost approximately $200. KELLY told the UCA that pistols manufactured by Glock or Smith and Wesson cost approximately $600. KELLY advised a "choppa" or Draco, which he described as an AK style pistol [7.62 caliber] would cost a "stack" . [$1000] to $1300. KELLY told the UCA that he really wanted a FN-57 pistol, which he described as a pistol that shoots rifle bullets and had an ammunition capacity of approximately 30 rounds. KELLY talked about the FN-57 style firearm saying it would "do some work…You can hit a whole car of motherfuckers…you can hit about five or six people…and still have like…eighteen bullets left...it'll keep a motherfucker off you." KELLY said he also liked Glock pistols because they are loud, would "shake up the block" and because they scared people. KELLY also discussed silencers and repeated that he wanted one because he was aware of law enforcement's ability to use sensors to detect gunshots. KELLY advised that if a silencer were used, the body would be found lying in the street and the police would not know who committed the crime. KELLY later told the UCA "You can hit about six-seven motherfucker and you gone…They won't know who shot em', how they got shot…That's the reason I want it." Later, KELLY told the UCA how to sterilize a firearm after it was used in a crime. KELLY advised that when he used a firearm, he would clean it and switch out the barrel. KELLY advised that he cleaned the barrel by scraping it with a gun tool,

explaining that during a forensic examination, the shell casing is matched to the barrel and if there is a match, then law enforcement can tell what firearm was used in a crime. As a result, KELLY, also asked if the UCA could get a gun [cleaning] kit. KELLY departed the UCA's vehicle and walked back towards the rear yard of **SUBJECT PREMISES 1,** and disappeared from view. The suspected crack cocaine was sent to the BPD drug laboratory for analysis; results are pending.

58.     On August 8, 2019 at an ATF investigator conducted surveillance of **SUBJECT PREMISES 1.** At approximately 7:17 am, KELLY was observed exiting and a short time later reentering **SUBJECT PREMISES 1.**

59.     On August 11, 2019, an Instagram live video was posted under an Instagram account believed to be operated by BARNES and with an Instagram handle of "coa_jb", with the "jb" portion of the handle suspected to be an acronym for Jamie Barnes. A single picture of BARNES is displayed under the account profile picture and photographs posted in the account show photographs of BARNES posing by himself and with others. Under the live video posted by BARNES, he was sitting inside of a vehicle, holding an apparent Uzi pistol and says "Dumb ass niggas don't want no smoke. Uzi game. We coming through letting shit go. I promise you. Uzi game..."



*BARNES in car with suspected Uzi pistol*

60.     On August 30, 2019, the UCA contacted KELLY at 443-814-2832 and sent him a photograph of a Glock pistol with a suppressor. KELLY advised that he wanted the Glock and attached suppressor if they were functional. KELLY also advised that he had lost his Glock firearm because his cousin was arrested with it recently.

61.     On or about September 1, 2019, BARNES posted an Instagram live video under his suspected IG handle, "coa_jb". BARNES is in the front seat of a vehicle along with a male and a female seated behind him. The male in the rear seat fans money, at which time BARNES begins fanning large denominations of cash, then fans a black semi-automatic pistol in front of the camera. Based on a view of the diameter of the barrel and the appearance of the pistol, the weapon appeared to be an operable firearm.

62.     On July 31, 2019, the UCA made a recorded telephone call to KELLY at 443-814-2832. During the telephone call, the UCA and KELLY discussed a future sale of firearms to KELLY. During the phone call, KELLY advised that he had recently purchased a new vehicle.

63.     In the early morning hours of September 1, 2019, an ATF investigator surveilled the 3200 block of Auchentoroly Terrace in Baltimore City in an effort to locate a vehicle with a temporary tag parked in the same area where KELLY regularly parked his vehicle.  This investigator observed a dark green BMW 330i, year unknown, bearing Maryland temporary tag 047023T (**SUBJECT VEHICLE 2).**  The vehicle was parked along the eastside of the 2300 block of Whittier Avenue and in the same vicinity that KELLY parked a blue Nissan Sentra numerous times before.

64.     On September 9, 2019, an ATF investigator conducting surveillance in the 3200 block of Auchentoroly Terrace saw KELLY exit the rear door of **SUBJECT PREMISES 1**. KELLY enter the driver's seat of **SUBJECT VEHICLE 2** and drive out of the neighborhood.

65.     Also on September 9, 2019, an ATF investigator conducting surveillance in the rear alley of the 3700 block of S. Hanover Street saw JOYNER exit the front door of **SUBJECT PREMISES 2,** walk into the block, approach a Gray colored Toyota Tacoma truck and reach into the front driver's side window with a clenched fist.  A moment later, the investigator observed JOYNER retract her hand from the inside of the vehicles cabin door with a handful of cash and walk away towards **SUBJECT PREMISES 2**.  Based on these observations and my training, knowledge and expertise I believe that JOYNER had conducted a hand-to-hand drug transaction. After the suspected transaction, a surveillance camera captured JOYNER walking immediately back into **SUBJECT PREMISES 2** approximately one minute later.  That same date, James YOUNG, a suspected associate of the DTO was also recorded entering and exiting **SUBJECT PREMISES 2.**

66.     On September 9, 2019, at approximately 11:45 am, near the 3700 block of 2nd Street, an ATF investigator also observed KELLY outside with two other unidentified males.

**SUBJECT VEHICLE 2** was parked nearby. A white female approached the group and appeared to make conversation with KELLY. After a moment, KELLY jogged to **SUBJECT VEHICLE 2,** opened the driver's side front door and was observed reaching into the inside area of the door to retrieve an item, believed to be suspected CDS. KELLY approached the female and appeared to conduct a hand-to-hand transaction with the female. As soon as the suspected deal was complete, the female walked away from the area. KELLY also walked away, counting a sum of money as he did so. Based on these observations and in light of my training, knowledge and expertise, I believe that KELLY has just made a sale of CDS that he had been storing in **SUBJECT VEHICLE 2.**

67.     On September 10, 2019, ATF investigators conducted a controlled purchase of suspected heroin from Tonya JOYNER. On that date CS-1 made a call to JOYNER at (443) 712-3814. During the phone call JOYNER asked CS-1 if he/she needed "girlfriend [crack cocaine] or "boyfriend" [heroin]. The CI asked to purchase five pieces of heroin. At approximately 11:48 am, a surveillance camera captured JOYNER exiting **SUBJECT PREMISES 2.** Investigators watched JOYNER exit the alley and walk directly to CS-1 waiting near the 3800 block of 2nd Street. JOYNER gave CS-1 five gel capsules containing suspected heroin in exchange for $50.00. A short time later JOYNER was observed reentering **SUBJECT PREMISES 2.** The suspected heroin was recovered and will be sent to the BPD drug laboratory for analysis; results are pending.

**E.     TABLE OF CONTROLLED PURCHASES**

68.     The following table lists the controlled purchases conducted during the pendency of this investigation:

| Target | Date | Suspected Drug | Drug Weight (grams) | Packaging | Cost |
|--------|------|----------------|---------------------|-----------|------|
| David RILEY | 3/14/2019 | Crack cocaine | 0.3 | Two (2) chunks/rocks | $40 |

| | 3/20/2019 | Crack cocaine | 6.3 | Two (2) jugs | $20 |
|---|---|---|---|---|---|
| David RILEY, Jamie BARNES, Sean MITCHELL | 3/28/2019 | Crack cocaine | 3.52 | Four (4) jugs, one (1) gel cap, two (2) plastic "zip" bags | $80 |
| Jamie BARNES | 4/3/2019 | Crack cocaine | 3.72 | Ten (10) jugs | $100 |
| Anthony FERGUSON | 4/9/2019 | Crack cocaine | 7.8 | Twenty (20) jugs | $100 |
| | 4/17/2019 | Crack cocaine | 9.5 | Eleven (11) jugs | $100 |
| | 4/24/2019 | Crack cocaine | 3.4 | 8 ball raw in clear plastic bag | $175 |
| | 5/1/2019 | Crack cocaine | 12.47 | Seventeen (17) jugs | $140 |
| | 5/7/2019 | Crack cocaine | 9.4 | Nineteen (19) jugs | $175 |
| | 5/16/2019 | Crack cocaine | 3.4 | 8 ball (1/8 oz) raw in clear plastic bag | $175 |
| Vaness KELLY | 5/23/2019 | Crack cocaine | 3.5 | 8 ball (1/8 oz) raw in clear plastic bag | $175 |
| | 6/6/2019 | Crack cocaine | 7.3 | 1/4 oz raw in clear plastic bag | $350 |
| | 6/12/2019 | Crack cocaine | 8.2 | 1/4 oz raw in clear plastic bag | 350 |
| | 6/20/2019 | Crack cocaine | 7 | 1/4 oz raw in two (2) clear plastic bags | 350 |
| | 6/25/2019 | Crack cocaine | 26.3 | 1 oz in clear plastic bag | $1400 |
| | 6/27/2019 | Crack cocaine | 31.1 | 1 oz in clear plastic bag | $1400 |
| | 7/12/2019 | Crack cocaine | 3.38 | 8 ball (1/8 oz) raw in clear plastic bag | $175 |
| | 7/31/2019 | Crack cocaine | 56 | 2 oz | $2800 |
| Tonya JOYNER | 9/10/2019 | Heroin | ~.4 | 5 gelatin capsules | $50 |

## F. CONCLUSION

69.     Based on the facts set forth above, there is probable cause to believe that Vaness

KELLY (aka "NESS"), Anthony FERGUSON (aka "ANTMOE, PAPERS"), Jamie BARNES (aka

"JOKER"), and David RILEY (aka "D") are conspiring to sell CDS to retail customers throughout Baltimore City.

## IV.   SUBJECT PREMISES AND SUBJECT VEHICLES

70.     Additionally, there is probable cause to believe that there is currently contained within the **SUBJECT PREMISES** and the **SUBJECT VEHICLES**, evidence of possession with the intent to distribute controlled substances and a conspiracy to possess with the intent to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846, as more fully described in Attachment B.

### A.    3200 Auchentoroly Terrace, 1R, Baltimore MD 21217 (SUBJECT PREMISE 1)

71.     **SUBJECT PREMISE 1** is believed to be the current residence of Vaness KELLY. The Baltimore, Gas and Electric account associated with **SUBJECT PREMISE 1** is listed to Jessica Devin Frierson. A query of Frierson's previous residences indicated that a prior residence used by Frierson was 4216 Eldone Road, #1, Baltimore MD 21229; the same address used by KELLY in the past.

72.     As noted above, investigators have conducted surveillance of **SUBJECT PREMISE 1** and seen KELLY enter and exiting **SUBJECT PREMISES 1** multiple times. Investigators saw KELLY at the residence most recently on September 4, 2019 at approximately 1:18 pm, when investigators observed KELLY exit **SUBJECT PREMISES 1** and enter **SUBJECT VEHICLE 2**. Based on the foregoing, I believe that KELLY resides at **SUBJECT PREMISES 1.**

73.     As noted above, based on my training and experience and my participation in this and other investigations, I know that drug traffickers frequently store certain items, e.g. documents, records, firearms, narcotics, narcotics proceeds at their residences or in their vehicles. In addition, investigators have seen KELLY exiting **SUBJECT PREMISE 1** immediately before conducting

CDS sales. Given this and the evidence noted above, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT PREMISES 1**, the items set forth in Attachment B.

**B.**   **3731 S. Hanover Street, 2nd floor (rear alley), Brooklyn, MD 21225 (SUBJECT PREMISE 2)**

74.    **SUBJECT PREMISE 2** is believed to be the current residence of Tonya JOYNER and used as a stash house for the DTO. **SUBJECT PREMISES 2** was frequented often by numerous DTO members, to include KELLY, FERGUSON, BARNES, RILEY, BURCH, and JOYNER in connection with narcotics sales. The said premises is a gray colored cement apartment located in the rear alley of the 3700 block of S. Hanover Street. A check of BG&E records for this location shows no account information.

75.    As noted above, members of the DTO have entered or exited **SUBJECT PREMISE 2** before or after suspected drug sales and before or after drug sales to CS-1, most recently on September 10, 2019.

76.    Based on my training and experience and my participation in this and other investigations, I know that certain items, e.g. documents, records, narcotics, narcotics proceeds are commonly maintained at associated residences of individuals involved in drug trafficking or the residences of their relatives or associates. Given this and the evidence of JOYNER, FERGUSON, KELLY, RILEY, BURCH and other's involvement in a narcotics trafficking conspiracy, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT PREMISE 2**, the items set forth in Attachment B.

C.   **2017 Blue Nissan Sentra bearing Maryland registration 7DC4082 and VIN: 3N1AB7AP1HY405825 (SUBJECT VEHICLE #1)**

77.   SUBJECT VEHICLE 1 is registered to Tawanda Denise Barber, of 960 Sourtherly Road, #353, Towson, Maryland.[9]  As noted above KELLY has been observed driving the vehicle on multiple occasions and has, in the past used the vehicle to travel directly to or from a narcotics transaction.  Over the course of this investigation, a GPS tracker on **SUBJECT VEHICLE 1** indicated that it was typically parked overnight at KELLY's residence.  Based on the foregoing, I believe **SUBJECT VEHICLE 1** is used by KELLY in furtherance of his narcotics trafficking.

78.   Based on my training and experience and my participation in this and other investigations, I know that certain items, e.g. documents, records, narcotics, narcotics proceeds are commonly maintained within vehicles operated by individuals involved in drug trafficking.  Based on this, KELLY's connection to the vehicle and the fact that it was used during and in connection to narcotics sales, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT VEHICLE 1**, the items set forth in Attachment B.

D.   **DARK GREEN BMW 330I COUPE, BEARING MARYLAND TEMPORARY TAG 047023T (SUBJECT VEHICLE 2).**

79.   **SUBJECT VEHICLE 2** is registered to Montell Gary Mills of 649 Bentalou Street, Baltimore, Maryland.[10]  As noted above KELLY has been observed driving the vehicle as recently as September 9, 2019 and I believe he used the vehicle in connection with a suspected drug transaction on the same day.  Based on the foregoing, I believe **SUBJECT VEHICLE 2** is used by KELLY in furtherance of his narcotics trafficking activities.

80.   Based on my training and experience and my participation in this and other investigations, I know that certain items, e.g. documents, records, narcotics, narcotics proceeds are

---

[9]  This individual's connection to the DTO, if any, is unknown.
[10]  This individual's connection to the DTO, if any, is unknown.

commonly maintained within vehicles operated by individuals involved in drug trafficking. Based on this, KELLY's connection to the vehicle and the fact that it was used during and in connection to a suspected narcotics sale, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT VEHICLE 2**, the items set forth in Attachment B.

## V. CONCLUSION

81.     Based on the foregoing affidavit, it is respectfully submitted that there is probable cause to believe that the TARGET SUBJECTS are (a) distributing and possessing with the intent to distribute heroin, cocaine and crack cocaine, and (b) conspiring to do so in violation of 21 U.S.C. §§ 841 and 846. It is further submitted that there is probable cause to believe that the **SUBJECT PREMISES** and the **SUBJECT VEHICLES** are being used for the storage and distribution of narcotics, narcotics proceeds, narcotics related documents, and the facilitation of narcotics offenses in violation of 21 U.S.C. §§ 841 and 846; and that there will be found in the **SUBJECT PREMISES** and the **SUBJECT VEHICLES** evidence, fruits, and instrumentalities of the aforementioned violations.

82.     WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue arrest warrants for the **TARGET SUBJECTS** and search warrants for the **SUBJECT PREMISES** and **SUBJECT VEHICLES** more fully described in Attachment A-1 through A-4, and authorize the search and seizure of the items described in Attachment B.

Special Agent Douglas Sarsfield
Bureau of Alcohol, Tobacco, Firearms and Explosives

19 - 3 0 1 5 BPG        19 - 3 0 1 5 BPG        19 - 3 0 1 5 BPG

19 - 3 0 1 6 BPG        19 - 3 0 1 7 BPG        19 - 3 0 1 8 BPG    19 - 3 0 1 9 BPG

Sworn to before me this 17TH day of September 2019 at 11:15 hours.        19 - 3 0 2 0 BPG

_____
Hon. Beth P. Gesner
United States Magistrate Judge